VOLPE CONSTRUCTION CO., INC. *vs.* THE FIRST NATIONAL
BANK OF BOSTON & another.[1]

No. 89-P-569.

Suffolk. November 9, 1990. - March 15, 1991.

Present: FINE, KAPLAN, & PORADA, JJ.

*Mechanic's Lien. Contract*, Building contract, Loan. *Mortgage*, Foreclo-
sure. *Real Property*, Mortgage. *Unjust Enrichment*.

A general contractor's notice of extension of the time for completion of a
building contract was without effect because it was recorded in the reg-
istry of deeds after the completion date as recited in the simultaneously
recorded notice of contract; consequently, the contractor's subsequent
steps to perfect a statutory mechanic's lien were untimely and also
failed. [253-255]

In an action by the general contractor on a building project against the
bank that made the construction loan to the owner, the summary judg-
ment record revealed no factual issues as to alleged defects in the
bank's foreclosure proceedings, or as to any alleged unfairness by the
bank with respect to the contractor's claim of a junior lien on the prop-
erty. [255-256]

A general contractor engaged by a nonprofit community housing corpora-
tion had no third-party beneficiary rights under a construction loan
agreement between the corporation and a bank. [256-258]

A general contractor on a building project undertaken by a nonprofit com-
munity housing corporation aquired no rights against the construction
lender either by reason of any provision in special legislation authoriz-
ing the Massachusetts Bay Transportation Authority to convey the site,
or under a land disposition agreement to which the contractor was not a
party. [258-259]

The bank that financed a construction project undertaken by a nonprofit
community housing corporation was entitled to summary judgment on
the general contractor's claims that the bank, through foreclosure, had
unjustly enriched itself at the contractor's expense, where the record
provided no factual support for a conclusion that the bank was in any
way an "alter ego" of the borrower, or held itself out as payor or guar-
antor of the borrower's debts, or acted in any manner other than as an
ordinary prudent lender. [259-263]

[1]SUFA Corporation.

CIVIL ACTION commenced in the Superior Court Department on January 8, 1987.

The case was heard by *Hiller B. Zobel*, J., on a motion for summary judgment.

*James W. Murphy* for the plaintiff.

*George E. Donovan* (*Domenic P. Aiello* with him) for the defendants.

KAPLAN, J. This is an unusual situation of a building project for "affordable" housing, in which the general contractor, which had direct contractual relations only with the owner-developer, tried to recover its alleged losses — amounts supposedly due it from the owner and unpaid — from the bank which made the construction loan to the owner. The contractor proposed a number of theories for shifting the onus onto the bank, but they fail.

### A. *The Documents.*

San Marco Housing Corporation (San Marco), a nonprofit community housing corporation, conceived a plan to build on Lincoln Wharf, Boston, on the site of a surplus power station of the Massachusetts Bay Transportation Authority (MBTA), a mixed income condominium development which would provide affordable housing to purchasers of the units, with preference to members of the North End community. San Marco bought the property from the MBTA; secured a construction loan of twenty-four million dollars from The First National Bank of Boston (Bank); and engaged Volpe Construction Company (Volpe) as general contractor for the project.

At the closing on June 5, 1984, the following documents were executed (various details of the instruments, as well as events postdating them, will be considered in the body of this opinion): Between San Marco and the Bank, a construction loan agreement, mortgage, and conditional assignment of interest in San Marco's construction contract with Volpe; a letter from Volpe to the Bank, by which Volpe assented to the conditional assignment of interest (see point D[3][a] *infra*); between San Marco and Volpe, a construction contract;

between the MBTA and San Marco, a deed conveying the property, and among these parties and the Executive Office of Transportation and Construction (EOTC), a Land Disposition Agreement (LDA).[2]

Further about the LDA: this instrument reflected the fact that the MBTA was conveying the property to San Marco pursuant to a special act of the Legislature, St. 1979, c. 784, as amended by St. 1981, c. 807. The statute authorized the sale for a below market price of $475,000 (paid by San Marco with the proceeds of the construction loan). Statutory conditions on the transfer were intended to assure that the property would be used for the housing purpose. If not so used for five years, the property was to revert to the Commonwealth. The condominium units were to be sold below market prices and so that the total sales revenues would equal the costs of the acquisition of the property plus the construction costs and (if required by the construction lender) a construction "contingency." Certain of the units would be sold to the general public at above cost but below market rates. The "profit" from these sales would be used to subsidize the below cost sales of the other units to a "preference class" of low-income North End residents. The initial unit owners would reimburse the Commonwealth to the extent of any profit they made in selling their units. The LDA stated that "the provisions of this Agreement shall be enforceable by the Secretary of Transportation and Construction . . . and the covenants contained herein shall be deemed to be covenants running with the land and enforceable against any party holding title to the land through foreclosure or a deed in lieu thereof or any purchaser from such a holder. . .".

## B. *Performance and Default.*

Volpe's construction contract was in the fixed amount of $16,002,450 and called for completion of the work within

---

[2]Another participant, not a party here, was Malmart Mortgage Co., which undertook to provide long term "take out" mortgage financing upon completion of the construction.

twenty-three and one-half months from the date of "commencement."

Work on the project did not proceed as planned. Volpe and San Marco fell out in disputes about delays due to alleged irregularities in the drawings provided by San Marco and about alleged withholding of progress payments. In June, 1986, Volpe informed the Bank (by the terms of the June 5, 1984, letter) that San Marco was in breach of the construction contract. On July 30, Volpe stopped work, and on August 19, San Marco formally terminated Volpe as general contractor. On August 12, Volpe had purported to file a mechanic's lien on the property.

San Marco engaged another firm, Napoli Wrecking Company, to complete the project. The Bank, on August 15, agreed with San Marco to extend the construction loan for one year and to modify its repayment and interest terms. However, the loan agreement as revised went into borrower's default, and in November, 1986, the Bank proceeded to foreclose. At the foreclosure sale on February 3, 1987, the Bank bid in for $21,038,736, an amount approximately equal to the sums laid out by the Bank up to the date of filing of Volpe's purported lien. The Bank assigned its bid to its wholly-owned subsidiary, SUFA Corporation (SUFA) for a consideration of $4,086,525. SUFA then purchased the property for the $21,038,736, with the Bank receiving a total of $25,125,261 — approximately what San Marco owed the Bank under the construction loan agreement. SUFA completed the project using the Napoli company.

The disputes between Volpe and San Marco are still unresolved. Volpe, having received approximately $14.5 million under its construction contract prior to dismissal, claims it is owed $4,964,960 for work done and unpaid. San Marco opposes the claim and asserts claims of its own against Volpe. An arbitration proceeding and a court action are pending between the parties and are ramified in content.

At best Volpe can likely recover little from San Marco, which has few assets. Volpe brings the present action against the Bank, as main defendant, upon the same alleged indebt-

edness. In addition to denials, the defendants asserted sundry counterclaims. We do not deal with the counterclaims, as the defendants' motions for summary judgment did not extend to them.[3]

## C. *Matters Under Review.*

Volpe's complaint, in seven counts, was met by the defendants' motions for summary judgment. The record includes, besides the documents already mentioned, sworn statements on either side.[4]

Volpe contends that it perfected a mechanic's lien on the property (count 2). The Bank says the effort failed. The Bank would also submit that the mortgage foreclosure would extinguish the mechanic's lien if one ever came into existence. Volpe contends generally that the mortgage foreclosure was illegal and invalid (count 6). Volpe claims further as third-party beneficiary of promises contained in the LDA (counts 1 and 7) and in the construction loan agreement (count 5). The judge granted summary judgment to the defendants on these five counts and Volpe appeals.

Volpe also sought relief against the defendants on grounds of unjust enrichment (counts 3 and 4). On these counts the judge denied summary judgment, and the defendants cross-appeal.

We affirm as to the five counts and reverse on the two remaining counts and order judgment for the defendants dismissing them.

## D. *Plaintiff's Appeal.*

(1) *Mechanic's lien not perfected.* The mechanic's lien statute is zealous of its own particular requirements and, like other disappointed claimants in, e.g., *Pratt & Forrest Co.* v. *Strand Realty Co.*, 233 Mass. 314 (1919), *Adams & Powers*

---

[3]The bank alleged malicious interference with contractual relationship, abuse of process, and violation of G. L. c. 93A, § 11. SUFA charged the same, except that the alleged interference was with an advantageous relationship.

[4]For the defendants: affidavits of Robert L. Fitzpatrick (Bank's vice president), Michael J. Capizzi (San Marco's project development consult-

*Co.* v. *Seder*, 257 Mass. 453 (1926), *Baltimore Contractors* v. *Dupree*, 352 Mass. 83 (1967), and *Blount Bros.* v. *Lafayette Place Assoc.*, 399 Mass. 632 (1987), the plaintiff Volpe did not exert itself sufficiently to comply. The construction contract of June 5, 1984, set no calendar date as the "completion date," but provided that "substantial completion shall be achieved not later than twenty-three and one-half . . . months after commencement," and commencement was to be "within [10] days after the later of the date on which a building permit issues and the date the owner closes construction financing." The financing was closed on the date of the contract, June 5, 1984. If we assume that the building permit was issued immediately, we may project the completion date to about June 2, 1986. More than 200 change orders were approved between February 8, 1985, and May 28, 1986, which had the effect of extending the "contract time" by 272 days, moving the completion date ahead to about mid-February, 1987. As noted, it was on August 12, 1986, that Volpe filed its "notice of contract" at the registry of deeds. Under the statute, the notice must specify a "completion date," see *Blount Bros.*, 399 Mass. at 635. Volpe gave June 2, 1986, as that date, which had already passed. Simultaneously with the notice of contract, on August 12, 1986, Volpe filed a "notice of extension" stating that the contract term had been extended and the later completion date was March 1, 1987. But a notice of extension must "be filed or recorded . . . prior to the date stated in the notice of the contract for the completion thereof," G. L. c. 254, § 2. This was not done.[5]

As the notice of extension failed, the effective completion date remained June 2, 1986, and subsequent steps to perfect the lien were unseasonable and also failed. Thus the "statement of account," to be filed within thirty days after the

---

ant), and Douglas M. Husid (EOTC's chief of staff), and Jeffrey Mann (auctioneer). For the plaintiff: affidavits of Peter J. Volpe (Volpe's treasurer), and Walter H. McLaughlin, Sr. (Volpe's attorney), and a deposition of Robert L. Fitzpatrick.

[5] We need not analyze the Bank's contention that Volpe failed in other respects to satisfy the statutory requirements.

completion date, see G. L. c. 254, § 8, was not in fact filed until September 17, 1986, well beyond the measuring period of thirty days from June 2, 1986.[6]

(2) *Regarding the mortgage foreclosure.* On the assumption that it perfected a mechanic's lien, Volpe has contended that it has priority to some or all of the funds realized at the auction.[7] We agree with the defendants that no such result would follow. The property was purchased by SUFA for $21,038,736, which was approximately equal to the Bank's advances under the construction loan to August 12, 1986, with no surplus. Thus the mechanic's lien (had it been formally correct) would have been extinguished or cancelled by the foreclosure sale. See G. L. c. 254, § 7; *Silver* v. *United States Trust Co.*, 280 Mass. 295, 299 (1932). We agree also with the defendants that the intercorporate SUFA transaction was irrelevant. It may be noted parenthetically that the total of $25,125,261 paid by SUFA to the Bank was derived from a $29 million construction loan by the Bank to SUFA.[8]

Claiming that it has standing as a junior lienor, Volpe attacks the validity of the foreclosure proceeding itself. The foreclosure suffered from no material defect. Volpe argues that proper notice of the foreclosure action was not given, but this is refuted by the legal notices reproduced in the rec-

---

[6]Had Volpe filed its notice of contract before the original contract completion date, it might have protected its lien by seasonably filing notices of extension to correspond with increments in construction time. The mechanic's lien law of Massachusetts bears comparison with the rationalized Uniform Law. See Uniform Simplification of Land Transfers Act §§ 5-101 - 5-402, Uniform Laws Annotated, Civil Procedural and Remedial Laws, at 312-361 (Master ed. 1990).

[7]Volpe proposed alternatively that it has priority (i) over all sums expended by the Bank, since those funds were not "unconditionally committed" before "notice of contract" was filed; (ii) over all sums advanced by the Bank over the original $24 million, since those funds were not unconditionally committed before the notice was filed; (iii) over all sums expended, from whatever source, after it filed the notice. As the sums disbursed prior to the notice were unconditionally committed, (i) falls out. And (ii) and (iii) fail, as explained below, because no surplus resulted from the foreclosure sale.

[8]Of the $29 million, $25,125,261 was immediately returned to the Bank to pay the sale price plus bid assignment fee; the remainder was used to complete work on the project.

ord; and the terms of sale were clear and clearly announced. Volpe charges that the auction was so conducted as to "prevent fair bidding." The argument is grounded on the fact that construction costs had not been officially certified at the time of the auction sale, and this could embarrass a potential purchaser in making a bid. But, first, the difficulty, such as it was, was not occasioned by the Bank: it resulted from the circumstance that the project was still incomplete and the EOTC had not yet commissioned an accounting of the costs. Second, the difficulty was theoretical, not real. The figures were not a mystery; at least in the round they would have been known to Volpe. So also, the facts of life, not any wicked design or conspiracy, made the Bank the only likely bidder. A bid from Volpe would have had to comprise cash in large amount, was unlikely, and did not happen. The Bank's bid was not unfair. It was under no obligation to raise its bid to cover a putative junior lienor. See *Steiner* v. *Schrank*, 253 Mass. 551, 552 (1925); *DesLauries* v. *Shea*, 300 Mass. 30, 37-38 (1938); *Seppala & Aho Constr. Co.* v. *Peterson*, 373 Mass. 316, 328 (1977).[9]

(3) *Third-party beneficiary claims.* (a) *Respecting the construction loan agreement.* Volpe looked for payment of its services under the construction contract to the other party to the contract, San Marco. The construction loan agreement was a distinct arrangement between the Bank and San Marco. It provided expressly that "nothing herein contained shall confer any right upon or benefit in any party other than the Borrower and the Lender." And it is plain that, "if two contracting parties expressly provide that some third party who will be benefited by performance shall have no legally

---

[9]The court in the *Silver* case, 280 Mass. at 299, said sweepingly: "They [builders whose interests are junior to a mortgagee] are in the unfortunate position of any workman who has added value to a mortgaged building under contract with the owner and has not been paid before the mortgage is foreclosed. The mortgagee or purchaser at foreclosure is not bound to pay either the contract price or the value added by the work, although what he obtains may be enhanced in value by that work. Neither has any relation of contract or *quasi* contract with the workman. The buyer, speaking generally, has paid in the price bid the value of the work. He is not enriched unjustly."

enforceable right, the courts should effectuate the expressed intent by denying the third party any direct remedy." 4 Corbin, Contracts § 777, at 25 (1951). See also *Hrushka* v. *State Dept. of Pub. Works & Highways*, 117 N.H. 1022, 1024 (1977); *Martin* v. *Dayton Seaside Corp.*, 25 Misc.2d 264, 266 (N.Y. Sup. Ct. 1960). Cf. *Government of Iraq* v. *Robert W. Hunt Co.*, 345 F.2d 788, 790 (9th Cir. 1965).

Volpe's June 5, 1984, letter to the Bank itself warned that the contractor "shall have no right to look to [the mortgagee Bank] for performance of the Owner's obligations hereunder unless and until Bank elects, in writing . . . to be substituted for the Owner and requires the Contractor to complete the Work in accordance with the Construction Contract for Bank's account." According to San Marco's conditional assignment of the construction contract to the Bank, assented to by Volpe, the Bank in case of default by San Marco[10] had the option to substitute itself. But at no stage did the Bank in fact substitute itself for San Marco.

Volpe attempts to use a letter from San Marco's attorney to Volpe's attorney antedating the execution of the relevant documents as some basis for spelling out a right of Volpe as third party against the Bank, but the attempt fails.[11]

Also ineffectual is Volpe's attempt to dilate on the fact that the Bank made certain "advances" of cash direct to Volpe.[12] The construction loan agreement states that "advances may be made at the Lender's sole election"; this is

---

[10]Under the construction loan agreement, the borrower would be in default if it failed diligently to proceed with the work, failed to make payments on the loan when due, etc., with an allowance of thirty days to cure before the Bank could exercise its option.

[11]The letter was intended to assure that the Bank would not keep Volpe waiting for more than thirty days to decide whether it would take over from San Marco after Volpe alleged a default. There is no intimation that the Bank (not a party to the letter) was going to bind itself to take over from San Marco on Volpe's demand. (We pass over objections to the admission of the letter on hearsay and parol evidence grounds.)

[12]As loan advances were made to San Marco only to satisfy contractors' bills, the Bank, with San Marco's consent, could readily bypass San Marco and pay the bills, debiting San Marco's account.

followed as a proviso by the sweeping language above quoted, "nothing herein contained" and so forth.

(b) *Respecting the statute and LDA.* Volpe takes the rather startling position that it is a third-party beneficiary of the special act of the Legislature and LDA and hence the Bank is required to pay its bill for its supposedly unpaid construction efforts. There is no indication in either the special act or LDA of any intention to benefit Volpe. The special act (and, by reference, LDA) does restrict the aggregate sale prices for all the units to an amount equal to the "sum of land acquisition and so-called hard and soft construction costs including a construction contingency if so required by the construction lender." St. 1979, c. 784, § 3, as amended by St. 1981, c. 807, § 2. This is an assurance to EOTC and the Commonwealth about the integrity of the basic plan of the project, but, as the judge wrote, "nowhere in the documents do the parties acknowledge the rights of Plaintiff (or any other building contractor) to recover construction costs."

Other companies which rendered construction services prior to the foreclosure, and remained on the job thereafter, were compensated by SUFA for their preforeclosure work. Volpe suggests that this indicates an understanding by SUFA and its parent, the Bank, that, as successors to San Marco, they were bound to make good San Marco's contract obligations, and such an understanding should be read back into LDA. The payments are better understood, quite simply, as necessary if the contractual relationships with these companies were to continue and the project brought to completion. The payments were unrelated to LDA or to Volpe.

Volpe attempts to get over the embarrassing fact that neither the Bank nor SUFA is a party to LDA by referring to the statement in LDA that the provisions thereof are covenants running with the land. As appears on inspection of LDA, the "provisions" do not bear on claims for construction costs nor could Volpe benefit from the provisions (whatever their meaning) as running covenants, since it does not hold, and never did hold, any estate in the property. See *Morse* v.

· *Aldrich*, 19 Pick. 449, 453 (1837); *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 90-91 (1979).

In response to the filing of the present action on January 8, 1987, the Bank, SUFA, EOTC, and the MBTA entered into an agreement dated July 22, 1987, whereby eleven units, with a total appraised market value of $2,950,000 were set aside, pending the action. Should Volpe prevail, the units were to be sold at a sufficient price to cover any judgment (up to $2,950,000) secured by Volpe against the Bank.[13] Volpe says this indicates an intention in LDA and the statute "to guarantee payment" to contractors like itself "out of the condominium sale proceeds." We see no such inferential intention. The arrangement made was precautionary. To give Volpe any benefit from it is to beg the very question whether there is a basis for a recovery by Volpe.

## E. *Defendants' Appeal.*

Anticipating that its specific counts might fail, Volpe in counts 3 and 4 made the rather general charge that the Bank had been unjustly enriched at Volpe's expense. The judge denied summary judgment against Volpe on those counts on the supposition that there were unresolved factual questions about "the extent of the Bank's involvement in the project, the foreclosure of San Marco's mortgage; and the value of the property acquired." We believe, however, that the record made, and largely described above, repels the claim of unjust enrichment, and there is no ground for remitting the matter to trial, with Volpe, like Micawber, hoping that something might turn up.

Count 3 goes on the theory that the Bank caused Volpe to rely, and Volpe relied reasonably, upon the Bank for satisfaction of San Marco's debts, and then, by causing the foreclosure of the mortgage,[14] received the value of some of Volpe's

---

[13]If the units were sold for more that $2,950,000 or the amount of the judgment, the excess would be given to the Lincoln Wharf Condominium Association.

[14]Volpe suggests in its brief a distinct claim of unjust enrichment against SUFA on the unsubstantiated assertion that the property was worth more than the $25,125,261 SUFA paid the Bank for it. But if the Bank's fore-

work without paying for it. In count 4, Volpe hypothesizes that the Bank withheld payments to San Marco, and thereby blocked certain progress payments due to Volpe.

Volpe did not furnish any specific factual substantiation of these propositions. Instead, on this appeal it argues at length that the Bank was the "alter ego" of San Marco and thus should be held liable for the latter's debts.

Volpe says that the position of the Bank in the present transactions was like that of the Department of Housing and Urban Development (HUD) in certain nonprofit housing projects, and that the law made in Federal courts with respect to HUD should apply also to the Bank. The Federal cases relied on are: *Trans-Bay Engrs. & Builders, Inc.* v. *Hills,* 551 F.2d 370, 381-383 (D.C. Cir. 1976); *S.S. Silberblatt, Inc.* v. *East Harlem Pilot Block,* 608 F.2d 28, 35-43 (2d Cir. 1979); *American Fid. Fire Ins. Co.* v. *Construcciones Werl, Inc.,* 407 F. Supp. 164, 184 (D.V.I. 1975); *F.W. Eversley & Co.* v. *East New York Non-Profit, HDFC, Inc.,* 409 F. Supp. 791, 795 (S.D.N.Y. 1976). All were concerned with housing projects financed under § 236 of the National Housing Act, as amended, 12 U.S.C. § 1715z-1. In each case, a nonprofit housing corporation, with the encouragement and under the direction of HUD,[15] engaged a contractor to build the affordable housing. When the project ran into difficulties, HUD, as guarantor and (because of foreclosure) eventual owner of the property, was held liable to pay sums owed to the contractor or its surety by the now insolvent nonprofit developer. HUD served not merely as guarantor of the construction loans but as the "guiding spirit" of § 236 projects, and exerted on them an "overarching con-

---

closure was not unfair, there is no need to consider how the Bank subsequently disposed of the property, here by intercorporate sale to SUFA.

[15]By the terms of § 236, HUD is authorized to provide mortgage insurance and interest reduction payments to certain builders of low income housing projects. Section 236 describes in detail how such projects are to be financed and how to be run when completed. The act sets limits on the rental charges, authorizes the Secretary of HUD to prescribe eligibility standards, and requires the approval of the Secretary in case of sale of individual units.

trol." *Trans-Bay*, 551 F.2d at 381. "Under § 236 HUD assumes almost all the indicia of actual ownership except the status of title holder of record." *S.S. Silberblatt*, 608 F.2d at 37. In a number of cases, HUD made oral promises to the contractors that it would guarantee payment of their bills. See, e.g., *F. W. Eversley*, 409 F.Supp. at 797.[16]

The Bank is not by any means a look-alike of HUD. The record shows that the Lincoln Wharf project was conceived, not by the Bank, but by San Marco with the assistance of an independent development consultant. (San Marco was an established corporation which had completed at least one other project in which the Bank took no part.) The consultant approached the Bank and asked it to provide financing. The Bank never held itself out as the payor or guarantor of San Marco's debts.[17] See *O'Connor* v. *Hurley*, 147 Mass. 145, 147 (1888); *LaChance* v. *Rigoli*, 325 Mass. 425, 427 (1950); *Salamon* v. *Terra*, 394 Mass. 857, 860-861 (1985). To the contrary, as we have seen, Volpe was informed that it could not look to the Bank for payment, except upon the Bank's choosing to assume the construction contract in case of default by San Marco.[18] There is nothing to indicate that the Bank held out any inducement to Volpe to continue on the job when San Marco appeared to be going into default; nor is

---

[16]Volpe cites a case not connected with HUD, *G. L. Wilson Bldg. Co.* v. *Leatherwood*, 268 F.Supp. 609 (W.D.N.C. 1967). This was a construction project where the owner received its primary loan from the Small Business Administration (SBA). SBA installed an "evaluation engineer" to supervise the project and put "all work done by the plaintiff . . . fully and completely under his direction, supervision, inspection, and subject to his full approval." *Id.* at 612-613. SBA promoted the project to further a government purpose to develop a depressed area of North Carolina. *Id.* at 617. Although SBA was aware of the owner's breach of agreement with SBA, it never informed the contractor and allowed him to continue work. When the owner stopped paying the contractor, SBA encouraged the contractor to proceed, and promised orally that payment would be forthcoming out of loan proceeds. *Id.* at 615. This did not occur, and consequently the court held the owner and SBA jointly and severally liable for the unpaid construction costs. *Id.* at 623.

[17]Volpe again refers to the letter mentioned at note 11, *supra*, which does not assist it.

[18]The information was conveyed in the very construction contract signed by Volpe and in its letter of June 5, 1984, to the Bank.

there intimation of any deceptive practice on the part of the Bank. Cf. *Superior Glass Co.* v. *First Bristol County Natl. Bank*, 380 Mass. 829, 833 (1980). The Bank did indeed have contract rights to certain controls over the project during the construction phase.[19] However, its involvement appears no greater than that of an ordinary prudent lender in a building construction transaction. See Kane, Creative Real Estate Financing 1990, at 75 (1990), setting out a model building loan agreement. Volpe nowhere begins to demonstrate the contrary; the statements of its brief remain at the level of "vague and general allegations of expected proof." *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 555-556 (1976), quoting from *Albre Marble & Tile Co.* v. *John Bowen Co.*, 338 Mass. 394, 397 (1959).

We note, finally, that cases can be found outside the HUD category, in the private construction field, where a lending bank, after making assurances of payment to a contractor, has failed adequately to finance a project, i.e., failed to disburse the full loan amount, and then attempted to reap the benefit of a contractor's work by foreclosing. The bank may be held in such a case at the suit of the contractor. See *Miller* v. *Mountain View Sav. & Loan Assn.*, 238 Cal. App. 2d 644, 663-664 (1965); *Gee* v. *Eberle*, 279 Pa. Super. Ct. 101, 125-126 (1980). Volpe does not cite or rely on these cases; they are not pertinent on the present facts. Here the Bank disbursed the full amount of the loan whose adequacy when made is unchallenged; it may not have been disbursed by San Marco as Volpe would have wished. Cf. *Myers-Macomber Engrs.* v. *M.L.W. Constr. Corp.*, 271 Pa. Super. 484, 491 (1979). If Volpe has not received its due (which has

---

[19]Volpe points out: the Bank employed a consulting architect and engineer (paid by San Marco) who approved all requests by San Marco for loan disbursements by the Bank to San Marco; the Bank's approval was needed for changes in building plans. The Bank had the right to approve all documents, sales contracts and selling prices related to the condominium, and was granted a power of attorney by San Marco to vote condominium shares. We have dealt with the matters of direct payments by the Bank to contractors, and Bank's option to take the Volpe construction contract over from San Marco on the latter's default.

been denied), it is the victim of a cost overrun on the project; had Volpe been paid, some other contractor would have remained unpaid. It would be unreasonable to hold the Bank liable on obligations incurred by San Marco over the amount of the loan extended to it by the Bank.[20]

To conclude on unjust enrichment and on the case. If the result is that Volpe will end with a true loss, that result is required because there is no party (other than San Marco) upon which the loss can be more justly placed. Volpe entered a construction contract with a virtually assetless corporation, to build a property whose resale value was extremely limited. It did nothing to protect itself against the possibility of a foreclosure by the Bank: it did not require a guarantee by the Bank or EOTC of San Marco's debts. It formally agreed not to look to the Bank for payment. Later, when disputes arose about payment, Volpe continued to do work to run up a deficit of about twenty-five percent of what it now claims it is owed. At the same time it did not timely file a mechanic's lien which could conceivably have given it some protection.

Construction projects can turn out to be risky. We have no role in manipulating the risks as allocated by agreement of a sophisticated contractor, owner, and lender when they enter the transaction.

The judgment appealed from, so far as it allows summary judgment for the defendants on the five counts, is affirmed; so far as it denies summary judgment for the defendants on the two counts, is reversed and, accordingly, summary judgment will enter dismissing those counts.[21]

*So ordered.*

---

[20]That the Bank had no expectation of long-term interest in or control of the project is shown by the elaborate "take-out" financing arrangements required of San Marco by the Bank before it made the loan. See note 2, *supra.*

[21]The judgment is properly here for review under Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), although the counterclaims may remain pending. See *Joseph A. Fortin Constr., Inc.* v. *Massachusetts Hous. Fin. Agency,* 392 Mass. 440, 441 n.2 (1984).