Wilkins, Douglas H., J.
The plaintiffs, Creative West Architects, LLC (“Creative West”) and CWA Architects, LLC (“CWA”) brought this action for payment for architectural services rendered to defendant Downtown Natick Development Company, LLC (“DNDC”) on a construction project (“Project”) at 20 South Avenue, Natick, Massachusetts (“Property”). They also have sued DNDC’s principal, Robert F. Rinaldi and have asserted a lender liability claim against defendant Needham Bank. The third amended complaint contains ten counts, four of which name the Bank as a defendant, including Count II (mechanics lien), Count VII (accounting), Count IX (intentional interference with contractual relations) and Count X (lender liability under the so-called instrumentality theoiy).
Needham Bank has moved for summary judgment on Counts II, VII and IX on the grounds that the plaintiffs did not perfect a lawful mechanics lien against the property and lack sufficient evidence to support their other claims. After amendment of the complaint, Needham Bank filed a supplemental motion for summary judgment on Count X, on the ground that the plaintiffs have not shown grounds for lender liability. The plaintiffs have opposed both motions. After hearing and review of the parties’ written submissions, the court ALLOWS Needham Bank’s motion for summary judgment and supplemental motion for summary judgment.
BACKGROUND
The facts apparent from the parties’ Rule 9A(b)(5) statements and reasonable inferences favorable to the plaintiffs are as follows.
The defendant, Robert F. Rinaldi formed DNDC as a single asset and single-purpose entity to own the Property and develop the Project. The Project was DNDC’s sole business. Needham Bank was the principal lender to DNDC on the Project, having extended a loan of $8,631,800, secured by a first mortgage on the Property. DNDC also gave a second mortgage to the seller of the property in the amount of $380,000.
On December 1, 2006, Creative West and CWA entered into separate contracts with DNDC for the provision of architectural services. The contracts provided in relevant part:
... at the sale of each unit DNDC will pay $12,000 per unit (total $96,000) of the stated deferred fees to Creative West Architects . . . Payment of the condo sale allocation to Creative West Architects shall be concurrent with, and a part of, the closing of the unit sales. In the event that DNDC cannot pay the full $12,000 at the closing of the unit sale, the unpaid balance shall incur a [sic] 6% interest ... Postponement of payment will be permitted only if DNDC can demonstrate that the monies cannot be paid at closing due to the proprietary debts to other parties who have position over Creative West Architects (i.e., the Bank and the previous owners of the property).
Creative West and CWA are owed more than $100,000 for design, management and consulting services in connection with the development of the Project. They have not been paid, for reasons having nothing to do with the quality or completeness of their work.
Needham Bank issued a construction loan for the Project. DNDC stopped making regular interest payments in April 2009, at which point Needham Bank declared the loan in default. At approximately the same time, Rinaldi returned to work full time at EMC. From that point on, DNDC had no further involvement in the Project. Needham Bank then paid RFR’s project manager and superintendent, Dean Laprade, directly in his individual capacity to finish and oversee completion of the Project. Creative West and CWA provided no services to the Project after April 2009.
*320 In May 2009, Needham Bank’s president prepared a letter to guarantee unconditionally its commitment to the Project. It then urged Rinaldi to try an accelerated marketing approach to auction the remaining units. In the summer of 2009, Needham Bank met on multiple occasions with an auctioneer concerning the private auction of the remaining units. It paid $64,000 from its own account for all up-front marketing costs to be incurred in publicizing the private auction. It also commented on, negotiated and signed a contract for auction services.
By August 2009 at the latest, Needham Bank had assumed final decision making authority on construction decisions. It was paying contractors directly for construction work performed on the Project and hired its own general contractor and subcontractors and used its own contract for these purposes. An entity wholly owned by Rinaldi, named RFR Enterprises, LLC (“RFR”), was the general contractor for the Project until Needham Bank replaced it with its own general contractor, Edgehill Construction Enterprises, Inc. (“Edgehill”), pursuant to an agreement dated September 28, 2009. As of September 30, 2009 at the latest, the Bank was no longer paying RFR. While Needham Bank honored and paid many of the contractual obligations owed by DNDC and RFR, it refused to pay the plaintiffs for their work. Instead, it hired a replacement design firm, M.Z.O. Architectural Group, Inc. (“MZO”). MZO was a preferred contractor of Needham Bank and has performed regular work for the Bank, including work on multiple Needham Bank branch offices.
As of September 2009, Needham Bank had taken over a presence in overall management of the Project. Rinaldi, DNDC and RFR were no longer involved in construction or financial decisions concerning the Project. The Bank never paid RFR. Edgehill’s principal never met or spoke with Rinaldi or any representative of RFR or DNDC. Whenever Edgehill needed direction, Edgehill went directly to Needham Bank. Needham Bank also controlled the finances of the Project. The Bank issued all construction payments directly and made all financial decisions regarding construction and development of the Project.
The Bank continued to work with and pay its own contractors and subcontractors directly at all times through the foreclosure sale on December 29, 2009. On several occasions Needham Bank met with its own general contractor, Edgehill, which took over all remaining construction activities, including the interior of units, the building exterior and common areas. Edgehill had long been a contractor for Needham Bank on all properties that the Bank expected to acquire at foreclosure.
As of September 2009 and continuing through foreclosure, Needham Bank also controlled unit sales. Two market rate units were under agreement and were scheduled to close prior to the November 2009 auction. One buyer walked away from the deal. Needham Bank extended the closing of the other unit until after foreclosure. Two additional units went under agreement at the auction. Pursuant to the mandatoiy auction terms, those sales were required to close within thirty days. Needham Bank postponed those sales until after it acquired title to the remaining units through foreclosure. It was in the borrower’s interest to consummate those closings prior to foreclosure (as originally agreed) because the outstanding loan obligations and potential deficiency of the borrower (DNDC and Rinaldi) would decrease considerably. The November 19, 2009 auction absolutely had a negative effect on the value of the Property.
On October 13, 2009, the plaintiffs recorded statements of account, listing the amounts they claimed were owed to them, at the Middlesex South District Registry of Deeds (“Registry”). The Bank contends that, at the time, DNDC owed $6,898,335.35 under its mortgage loan. The plaintiffs contend that the balance was $6,428,580.00 as of October 5, 2009. No payments were made after October 5, 2009.
On December 29, 2009, Needham Bank acquired the Property at foreclosure for a bid of $6.7 million through a subsidiary, resulting in what the Bank claims was a substantial deficiency remaining on its loan. That same day, DNDC filed a Certificate of Cancellation with the Massachusetts Secretary of State.
The plaintiffs filed this case on November 17, 2009. The plaintiffs never recorded an attested copy of the complaint in this action with the Registry. DNDC was defaulted in this case for failure to answer or defend on September 17, 2010.
DISCUSSION
The plaintiffs’ primary theory seeks to hold Need-ham Bank liable to them for DNDC’s debts under a so-called “instrumentality theory.” Under that doctrine, “a lender may be held liable . . . when the lender exerts such a degree of control over the borrower that the borrower becomes a mere business conduit for the lender . . . The instrumentality theory is akin to the piercing of the corporate veil doctrine, and has generally been used by Third Party creditors seeking to hold a lender liable for the debts of the borrower.” FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 104 (1st Cir. 2009) (citations omitted). The plaintiffs must make “a strong showing that the creditor assumed actual, participatory, total control of the debtor”; the facts must “unmistakably show[ ] that the subservient corporation was being used to further the purposes of the dominant corporation and that the subservient corporation in reality had no separate, independent existence of its own.” Id. at 105 (citations omitted).
The undisputed facts fall far short of meeting this burden. They show that Needham Bank took control of the Project upon default, but acted on its own account and not through DNDC. The instrumentality theory addresses control over the borrower itself, not *321 the project. The Bank here did nothing more than act to protect and realize its security, in which it had rights as a result of the mortgage transaction between it and DNDC. It never “assumed actual, participatory, total control” of DNDC as opposed to the Project. Id. See also Schwan’s Sales Enterprises, Inc. v. Commerce Bank & Trust Co., 397 F.Sup.2d 197-98 (D.Mass. 2005); Healy v. McGhan Med. Corp., 2001 WL 717110 at *6 (Super.Ct. March 29, 2001).
Moreover, the plaintiffs’ own contract with DNDC acknowledged Needham Bank’s status as a senior creditor and specifically recognized that the Bank would be paid first. There is nothing “unjust” about a creditor’s exercise of rights set forth in a mortgage, particularly as against plaintiffs who knew of those rights and agreed to take a junior position. See Schwan’s, 397 F.Sup. at 197-98 (instrumentality theory requires showing an “unjust result”).[1] Cf. Volpe Construction Co., Inc. v. First National Bank of Boston, 30 Mass.App.Ct. 249, 262-63 (1991) (Courts “have no role in manipulating the risks as allocated by agreement of a sophisticated contractor, owner, and lender when they enter the transaction”). To impose liability on facts like those present here would impair the value of collateral and chill the extension of credit for housing projects.[2]
On their mechanics lien claim, the plaintiffs cannot show “strict compliance with statute,” as required. National Lumber Company v. United Casualty and Surety Ins. Co, Inc., 440 Mass. 723, 726 (2004). Filing the notice of contract on October 5, 2009 failed to comply with the requirement in G.L.c. 254, §2 that such filing occur within 90 days of the last performance of work on the Project—which in this case occurred in April 2009. Nor did the plaintiffs record an attested copy of the complaint within 30 days of the commencement of this action, as required by G.L.c. 254, §5. Under that section, any lien was dissolved on the 31st day. Moreover, any mechanic’s lien was extinguished by the December 29, 2009 foreclosure. Volpe Construction, 30 Mass.App.Ct. at 255.[3]
The claim of intentional interference with contractual relations fails for many reasons, including the express reference in the plaintiffs’ contracts to the Bank’s senior secured interests. It is difficult to conceive of a claim for interference with a contract by a senior creditor whose status as such is squarely recognized in the only relevant contracts.
More fundamentally, the Bank cannot be held liable for employing legitimate means to act to protect its interests upon default, in the absence of improper motive. See generally United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812, 815-17 (1990). The Bank had no contractual, fiduciary or other obligations to the plaintiffs. Acting in its own interests as secured lender was not improper in means or motive. Id. at 817 (“apparent motives were to benefit his customers and himself financially”). Offering “inducements” (in plaintiffs words) to Rinaldi to participate in the auction or otherwise to comply with the Bank’s plan to maximize repayment while avoiding foreclosure amounted to nothing more than a lender’s attempt to realize on its security. “There is no evidence that [the Bank] used threats, misrepresented any facts, defamed anyone or used any other improper means in relation to . . . the existing contract...” Id. That the Bank’s self-interested actions allegedly had the effect of reducing funds to pay the plaintiffs does not make them improper in means or motive. The suggestion that the Bank actually wanted to injure the plaintiffs is entirely speculative. The facts do not support a reasonable inference of improper motive, particularly where the Bank’s first mortgage placed it in a senior position in all respects, such that it stood to gain nothing from the plaintiffs’ loss. Id. (“There is not enough evidence to warrant a finding that his real motive in these matters was to hurt [plaintiff]”).
Finally, the Bank did not commit any act amounting to interference with the contract itself, as opposed to assertion of rights secured by the Bank’s mortgage interests. While the plaintiffs wanted the Bank to try harder to generate more funds, they cite no case suggesting that a failure to do more amounts to “interference.” The Bank’s acts in its own interest in no way promoted DNDC’s breach of the contracts. DNDC’s lack of funds did that.
The claim for an accounting fails. For one thing, the plaintiffs have not argued in opposition to summary judgment on this point. Nor have they contested that they have received the information that an accounting would provide, thus mooting Count VII. Finally, an accounting would not benefit the plaintiffs, who are not secured parties, where the Bank’s account shows that it was a secured party that was unable to collect the full amount due to it.
Finally, I reject the request for additional time to complete discovery under Mass.R.Civ.P. 56(f). The complaint has been pending since November 17, 2009 and plaintiffs’ motion to add Mr. Rinaldi as a party was allowed on April 15, 2010. The plaintiffs have not pointed to any material facts possessed exclusively by Mr. Rinaldi. They highlight Mr. Rinaldi’s role in negotiating the contracts at issue, but that is irrelevant, as the contracts are clear on their face in all material respects. The facts concerning the November 19th auction are before the court through other witnesses and have been fully considered on summary judgment.[4] Indeed, the plaintiffs assert that “the current record is replete with evidence of Needham Bank’s improper interference.” Mr. Rinaldi’s testimony would be cumulative.[5] The plaintiffs’ claim fails not for lack of discovery, but because the alleged facts and favorable inferences therefrom do not add up to a viable claim for intentional interference with contractual relations.
*322 CONCLUSION
For the above reasons, the Needham Bank’s Motion for Summary Judgment and Supplemental Motion for Summary Judgment are ALLOWED. Judgment shall enter for Needham Bank dismissing all claims against it, namely Counts II, VII, IX and X.

Activity that is “normal commercial practice for a lender” would not trigger liability even under case law cited by plaintiffs. Kennedy v. Columbia Lumber and Mfg. Co., 299 S.C. 335, 340, 384 S.E.2d 730, 734 (1989).

Because Count X fails to state a claim on its own terms, it is not necessary to resolve whether any decision not to sell condominium units prior to foreclose was dictated or affected by the encumbrance resulting from the plaintiffs’ filing a lien at the Registry.

It is also open to serious question whether the mechanics lien statute even applies to contracts for design services. See Libbey v. Tidden 192 Mass. 175 (1906). The other problems with the plaintiffs claims makes it unnecessary to resolve that issue, or to address whether the agreement encompassed non-design services that fall within the statutory scope.

For instance, I have considered the inducements offered to Mr. Rinaldi as set forth in paragraphs 18-19 of the affidavit of Jonathon Warner, which the Bank has not moved to strike.

I am of course aware that Mr. Rinaldi remains a party to this case, whose deposition will likely occur anyway on or before May 15, 2011, pursuant to my order of January 20, 2011. The claims against Rinaldi appear factually intertwined with the claims against the Bank to the point where line-drawing disputes on the scope of discovery are reasonably likely to consume significant time and effort of the parties, if not the court. To avoid potential discovery disputes and any possible prejudice to the plaintiffs (however unlikely) from Mr. Rinaldi’s unavailability and notwithstanding today’s award of summary judgment to the Bank, deposition questions relating to the claims against the Bank shall be deemed within the scope of permissible discovery at Mr. Rinaldi’s deposition. Should the Rinaldi deposition unexpectedly reveal any facts beyond the scope of those that I today find insufficient to support the claims against the Bank, any motion for reconsideration shall be limited to such facts and shall be filed by the June 15, 2011 summary judgment deadline.