Michael E. FERRIS, Sr., Michael E. Ferris, Jr., and Louise Ferris, Plaintiffs,

v.

**FEDERAL HOME LOAN MORTGAGE CORPORATION and Marine Midland Mortgage (USA), Inc., Defendants.**

No. 94–Civ–10470–MEL.

United States District Court, D. Massachusetts.

March 7, 1995.

Thomas J. Gleason, Gleason Law Offices, Haverhill, MA, for Plaintiffs.

Harvey M. Forman, Forman & Forman, Boston, MA, for Defendant Federal Home Loan Mortgage Corp.

LASKER, District Judge.

Michael E. Ferris, Jr. and two of his family members have sued both the Federal Home Loan Mortgage Corporation ("Freddie Mac") and Marine Midland Mortgage (USA), Inc., the holder and servicer, respectively, of a mortgage which Ferris executed in connection with the purchase of a three unit house in Lawrence, Massachusetts. After a bench trial, I conclude that each of the plaintiffs' claims is without merit.

### I.

No material fact disputes emerged at trial. The plaintiffs purchased the Lawrence property for $130,000 on August 29, 1986. Joint

Exhibit 1.[1] The lion's share of the purchase price—$117,000—was financed through a loan from Farragut Mortgage Co., Inc., evidenced by a 9.95% fixed rate note and an accompanying mortgage on the property. Exs. 2 and 3. On February 2, 1988, Farragut assigned its servicing rights to Marine Midland. Exs. 5 and 6. Sometime prior to that date (the record is unclear as to precisely when), Farragut's ownership interest in the mortgage had been transferred to Freddie Mac.

The mortgage note provided for monthly payments of principal and interest of $1,022.44. The plaintiffs were also required to make monthly contributions to an escrow account maintained by Marine Midland from which taxes and insurance on the property were paid. For the first year and a half of the mortgage term, the amount of the monthly contribution was $132.56. Initially, the plaintiffs made these payments without incident, using coupon books provided by Marine Midland. Ex. 7. Each coupon book contained a coupon for each monthly mortgage payment, specifying the due date and the amount of each. In the case of payments made on the first coupon book, the amount of each monthly payment was $1,155.00 ($1,022.44 principal and interest plus $132.56 escrow contribution).

In 1989, Ferris began receiving from Marine Midland new coupon books that still called for principal and interest payments of $1022.44, but required different amounts of monthly contributions to the escrow account. The first new book arrived in August 1989 and called for total monthly payments of $1,877.87—that is, an escrow contribution of $722.87. Ferris received a third coupon book in March 1990 calling for monthly escrow payments of $537.02. Ex. 15. The escrow analysis contained in this third book indicated that the book was effective October 1, 1989—six months before it was received. The amount of the monthly escrow payments was reduced further in May 1990, when a fourth coupon book set them at $386.77—again retroactively, this time to January 1, 1990. A fifth and final book, received in August 1990 and effective September 1, 1990, called for escrow payments of $332.06. Each of the replacement coupon books indicated that the plaintiffs had substantial shortfalls in their escrow account.[2]

Because he had consistently paid Marine Midland $1,155.00 every month in accordance with what he thought were the terms of his mortgage, Ferris was confused by this series of coupon books calling for revised payments. Each book contained an "escrow analysis" purporting to explain changes in the amount due. Beyond highlighting the fact that the adjustments in his required monthly payments were due to changes in escrow requirements, however, these analyses shed little light.

After the first new coupon book arrived in August 1989, Ferris phoned Marine Midland to determine why the amount due on his mortgage had changed. The employee who spoke to Ferris, a woman whose name he did not recall, could not explain the adjustments to his payment schedule. According to Ferris, she did, however, instruct him to continue paying the $1,155.00 per month until the reason for the adjustment could be identified. He did so, sending a check for $1,155.00 on September 7. Ex. 9.

Shortly thereafter, Ferris received a letter from Marine Midland dated September 15, stating that his September 7 check failed to cover his September mortgage payment obligation which, it reiterated, was $1,877.87, in accordance with the coupon book received in August. Ex. 11. In response to this letter, Ferris phoned Marine Midland again and spoke to a different employee; once again, in spite of the letter, he was told to continue paying $1,155.00 until the problem could be resolved. Also in mid-September, Ferris received a letter from the plaintiffs' mortgage insurer informing him that the plaintiffs' mortgage insurance policy would be can-

---

1. At trial, it was agreed between the parties that all exhibits would be submitted jointly. "Joint Exhibit" will be abbreviated herein as "Ex.".

2. The shortfalls were specified to be:

| August 1989: | $4938.94 |
| March 1990: | $3338.60 |
| May 1990: | $1535.61 |
| August 1990: | $879.07 |

celled unless they began paying in full. Ex. 10. It is unclear whether this letter arrived before or after Ferris phoned Marine Midland for the second time. In any event, he apparently did not contact the mortgage insurer directly in response to it.

Ferris continued to pay $1,155.00 a month and received no further communication from either Marine Midland or the mortgage insurer until, in March 1990, he received the third coupon book, specifying a new monthly escrow payment and showing a new escrow shortfall. In April 1990, Ferris received another letter from the plaintiffs' mortgage insurer, this one claiming that the plaintiffs were delinquent in their payment of *principal and interest* (not escrow contributions) to the extent of $4,923.74. Ex. 16. Once again, Ferris phoned Marine Midland to attempt to determine why his payment obligations were changing so unpredictably and, once again, he did not receive an explanation. In frustration, he informed the bank representative that he would make no further payments on his mortgage until the amount he owed each month was conclusively established. Starting in April 1990, he began paying what would have been his monthly mortgage payments—each presumably $1,155.00—into a savings account. The record does not reflect how long he continued this practice of setting aside monthly mortgage payments.

In May 1990, Ferris received a fourth coupon book and had another inconclusive phone conversation with a Marine Midland representative. That month he also received a letter from Marine Midland to the effect that the plaintiffs' mortgage was in default for the period January 1 through May 1, 1990 to the extent of $7098.68. Ex. 18. The letter stated that if the deficiency was not cured by June 30, 1990, the loan would become due in its entirety and Marine Midland would commence foreclosure proceedings. Ferris again phoned Marine Midland and informed the bank that he disputed the amount due and that, in any event, he was financially unable to make a payment of $7098.68 at that time.

Commencing on May 23, 1990, Ferris had a series of conversations with Shawn Kovell, a Marine Midland employee who dealt exclusively with accounts which were in default.

Ferris testified that Kovell was quite helpful and explained to him at length how his mortgage payments had been applied and how the shortfall in his account had arisen.

Kovell repeated the substance of his explanation at trial. Diane Robinson, another Marine Midland employee, offered further testimony as to how the plaintiffs' mortgage fell into default. They described the repeated adjustments to the plaintiffs' monthly payment obligations and the shortfalls in their escrow and principal and interest accounts as primarily the result of both the bank's and the plaintiffs' failure to allocate responsibility for fees and taxes on the property correctly. Early in the term of the mortgage, the plaintiffs' apparently failed to pay the water and sewer fees which they were obligated to pay directly. Marine Midland began paying these fees because the city of Lawrence would not accept payment of local property taxes, which were properly paid out of the escrow account, unless the water and sewer obligations were met first. Lawrence also initially overbilled Marine Midland for property taxes.

Not surprisingly, these unforeseen expenditures quickly created a severe drain on the plaintiffs' escrow account. Once this drain was discovered during a routine review, the plaintiffs' monthly payment obligation shot up. Compounding the shortfall was the fact that the bank, unbeknownst to Ferris, compensated for Ferris' monthly payments being too low to cover the recalculated escrow obligation by holding a given monthly payment until the following month's payment arrived, applying a portion of that second payment to pay the first month's bill fully, and holding the remainder until the following month, when the process would be repeated. The inevitable result was that, over time, the portion of each monthly payment that remained after the bank "carried back" enough to satisfy the previous month's payment would become smaller and smaller to the point where the entire amount of a given month's payment would be carried back to previous months. Hence the bank's assertion on May 23, 1990 that the plaintiffs hadn't paid since January 1, 1990 when in fact they had paid through March 1990. Finally, Fer-

ris' refusal to make any payments on his mortgage after March 1990 contributed significantly to the amount of the shortfall.

Having provided Ferris with an explanation which, at trial, Ferris said he understood,[3] Kovell informed Ferris that Marine Midland required the plaintiffs to provide the bank with full payment, or an acceptable plan leading to full payment, by June 21, 1995 or the bank would foreclose. Ferris reiterated that the plaintiffs' did not have the resources to bring the loan up to date. In mid-July 1990, Ferris received a letter from Marine Midland to the effect that the bank had engaged a law firm in Massachusetts to commence foreclosure proceedings. Ex. 20.

Ferris received the fifth and final coupon book in August 1990, calling for monthly payments of $1,354.50. For reasons that are not entirely clear, Ferris paid his mortgage bill for September and October 1990 on November 1, 1990 at this new rate—$2,709 total. Ex. 22. On March 1, 1991, Ferris received a letter from Marine Midland's counsel containing a check for $3,055.08, which purported to return the November 1 payment on the grounds that it was insufficient to reinstate the plaintiffs' account. Ex. 23. From that point, after some effort at settling the matter between counsel, Exs. 24–27, 29, foreclosure proceedings went forward and a foreclosure sale was held on September 6, 1991.

## II.

No one familiar with the facts of this case would contend that Marine Midland provided the plaintiffs with exemplary service. That is not to say, however, that the bank's conduct was actionable and it certainly does not absolve the plaintiffs of the obligation to repay a valid debt. The plaintiffs assert several claims here, all of which are grounded in the seeming assumption that a bank is obligated to ensure that its customers not be confused by its billing practices. In the absence of conduct on the part of the bank that is more egregious than has been alleged here, the law does not impose such an obli-

gation. Each of the plaintiffs' claims is therefore dismissed.

## A.

The plaintiffs' first claim is for a declaratory judgment under M.G.L. c. 231A, §§ 1–9 delineating the rights and responsibilities of the parties to the mortgage agreement. M.G.L. c. 231A, § 1 provides that a court with proper jurisdiction "may on appropriate proceedings make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen and is specifically set forth in the pleadings and whether any consequential judgment or relief is or could be claimed at law or in equity or not...." M.G.L. c. 231A, § 2 states explicitly that contractual disputes are appropriately resolved under this provision. While this claim is somewhat superfluous in light of counts 2 through 5, it is perhaps worthwhile to note here certain conclusions that are dispositive of the plaintiffs' claims generally.

The plaintiffs borrowed money from the defendants, agreeing to pay it back subject to certain conditions, some of which are contained in the terms of the mortgage agreement and some of which are implied by law. The plaintiffs have described only vaguely which of those conditions they allege Marine Midland has violated—and even then they provide no evidence to support what they have alleged. The plaintiffs' claim that Marine Midland's service was, on the whole, poor rings true. Poor service, however, is not in and of itself violative of either the mortgage agreement or any duty owed the plaintiffs. The plaintiffs were therefore bound to fulfill the terms of their mortgage obligations and their failure to do so was an appropriate grounds for foreclosure.

## B.

In their complaint, the plaintiffs allege that Marine Midland breached the mortgage agreement by "[f]ailing to properly analyze

---

**3.** Ferris, who took extensive notes during his conversation with Kovell, Ex. 19, emphasized at trial that he understood the bank's calculations but thought they were incorrect. However, he failed even to suggest how Kovell's explanation was flawed.

the plaintiffs' escrow account," "[a]llowing the plaintiffs' escrow account to accrue a significant negative balance without notifying the plaintiffs," "[m]isapplying the plaintiffs' principal and interest payments," and "[f]ailing to inform the plaintiffs of the correct mortgage payment, plus insurance and taxes."[4] Asked before trial which provision of the mortgage agreement they contend was violated, the plaintiffs identified paragraph 19, which required the lender to notify the borrower that the mortgage note was in default at least 30 days before the lender took action to accelerate the mortgage or initiate foreclosure proceedings.

Nothing Marine Midland did or is alleged to have done violated this provision. The plaintiffs' received adequate and timely notice of Marine Midland's intention to accelerate, and later foreclose on, the mortgage and were given ample opportunity either to pay the remaining amount of the mortgage debt or propose an acceptable repayment schedule prior to both acceleration and foreclosure.

■ The plaintiffs also contend that the various Marine Midland employees who counseled Ferris to continue paying the plaintiffs' accustomed monthly payment of $1,155.00 pending further analysis of his account thereby orally modified the mortgage agreement. This argument fails on at least two grounds. First, Ferris could not reasonably believe that statements by the bank employees that were, by his own description, offered as off-hand suggestions after each employee making them admitted that she was unsure how to proceed, could be intended as serious offers to modify the terms of the plaintiffs' mortgage indebtedness. Second, Ferris also could not reasonably believe that the employees with whom he spoke held themselves out to be—or in fact were—authorized to bind Marine Midland to a modification of the mortgage agreement. Ferris himself seems to have realized as much, given the fact that the first time he raised the issue of oral modification was on the eve of trial.

4. The plaintiffs make the same allegations in

## C.

■ The plaintiffs' third claim is that Marine Midland breached the covenant of good faith and fair dealing which every contract impliedly contains under Massachusetts law. In *Shawmut Bank, N.A. v. Wayman*, 34 Mass.App.Ct. 20, 606 N.E.2d 925 (1993), the Massachusetts Court of Appeals noted that, in the context of a bank's relationship with a guarantor, the covenant of good faith and fair dealing requires that the bank be "honest in its dealings" with the guarantor and that it not "purposefully injure [the guarantor's] right to obtain the benefit of the [guaranty] contract." *Id.* at 928. A bank would certainly owe no greater or lesser duty to a mortgagor.

No evidence was introduced at trial which indicated that Marine Midland dealt with the plaintiffs in a spirit of anything less than good faith and the *Wayman* case itself ruled that merely providing bad service does not constitute acting in bad faith. There, Shawmut Bank failed to disclose to a guarantor (albeit one who had signed a waiver of her right to be kept informed about the bank's dealings with the borrower) the fact that it had made new loans to a borrower, whose principal later misappropriated the borrowed funds. Addressing the guarantor's argument that, the waiver aside, the bank's failure to notify her of the new borrowing constituted bad faith which absolved her of the obligation to perform under the guaranty, the Massachusetts court wrote:

> "Shawmut could certainly have been more diligent in its monitoring and its lending decisions with respect to [the borrower]. The right to monitor [the borrower] was for its own benefit, however, not the guarantor's. In sum, if we assume a duty of good faith to exist in the circumstances, there has been no showing of actions on Shawmut's part amounting to bad faith."

606 N.E.2d at 928 (citation omitted). The instant case is, in all material respects, on all fours with *Wayman*. Marine Midland's failure to provide information that it was under no legal or contractual obligation to provide does not constitute bad faith or unfair dealing.

connection with each of counts two through five.

### D.

 The plaintiffs next contend that the defendant was negligent in its handling of their mortgage account. Assuming that Marine Midland, independent of any contractual obligations, owed a duty of care to the plaintiffs to properly analyze the plaintiffs' escrow account, notify the plaintiffs in the event of an escrow shortfall, inform them of the correct payment amount and apply principal and interest payments correctly—a proposition that is far from certain—the evidence at trial established that Marine Midland did not violate that duty of care. After some fumbling and initial missteps, neither of which are forbidden by any duty of care owed the plaintiffs, Marine Midland did eventually arrive at a correct analysis of the plaintiffs' account.[5] Marine Midland did not owe the plaintiffs a duty to analyze their mortgage correctly either the first time or within a certain time. As for the issue of notice, Marine Midland was under no duty to promptly notify the plaintiffs of any shortfall in their account. Rather, under paragraph 19 of the mortgage agreement, the bank's obligation was to give the plaintiffs adequate notice of any impending acceleration or foreclosure of the mortgage loan. As described above, the evidence indicates that Marine Midland met this obligation. In sum, to say that the bank was clumsy is not to say that it was negligent.

### E.

Finally, the plaintiffs allege that Marine Midland's actions violated M.G.L. c. 93A, § 11, which provides that "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice ... may ... bring an action ... for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper." On its face, this provision requires both bad faith and a level of intent to do harm on the part of the defendant which, as the foregoing discussion should make clear, does not exist in this case. The claim therefore fails.

\*   \*   \*   \*   \*   \*

The plaintiffs have not prevailed on any of their claims against Marine Midland and, accordingly, the complaint is dismissed.

---

5. At any rate, if the plaintiffs dispute the amount that Marine Midland eventually determined was owed, they introduced no evidence indicating that the determination was incorrect.