# United States Court of Appeals
## For the First Circuit

No. 08-1955

FAMM STEEL, INC.; AUSTIN REALTY, LTD.,

Plaintiffs, Appellants,

ANN GAVIN; PAUL GAVIN,

Plaintiffs,

v.

SOVEREIGN BANK,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Susan D. Novins with whom Seegel Lipshutz & Wilchins LLP was on brief for appellants.
Richard E. Gentilli with whom Howard M. Brown, Lauren A. Solar, and Bartlett Hackett Feinberg P.C. were on brief for appellee.

June 12, 2009

**LYNCH**, **Chief Judge**.  This case involves a once-profitable steel fabricating company, FAMM Steel, Inc. ("FAMM"), that fell on hard times while trying to expand its business.  The company defaulted on its loans, and it was shut down and had its assets liquidated in 2004.  Thereafter, it brought suit against Sovereign Bank ("Sovereign"), which provided the loans, claiming that the bank had caused its demise by forcing it to hire an incompetent financial manager who mismanaged the company's accounts and then engaging in a course of action that exacerbated the problem.  The company alleged the bank was liable under a slew of theories, including an instrumentality theory, breach of the implied covenant of good faith and fair dealings, breach of fiduciary duty, fraud, duress, and interference with advantageous business relations.

The district court granted the defendant bank summary judgment in a careful and well-reasoned opinion.  Gavin v. Sovereign Bank, No. 06-12314, 2008 WL 2622839 (D. Mass. June 30, 2008).  We affirm.  This is our first occasion to deal with the "instrumentality" theory of lender liability.

I.

We describe the facts as outlined by plaintiffs.  FAMM was a family-owned steel fabricating company that operated out of Rindge, New Hampshire.  It built projects such as ballparks, hotels, apartments, and office buildings throughout the Northeast.  FAMM's sales revenue was $1.8 million at the end of 1995 and grew

-2-

to $27 million by the end of 2000. FAMM was run by Ann Gavin, who served as the company's President and Secretary, and her father Paul Gavin, who served as its Vice President and Treasurer. Austin Realty, Ltd. ("Austin") was the record title owner of FAMM's fabrication facility in Rindge.

In 1998, as its business expanded, FAMM developed a plan to expand its facility and revamp its operations by purchasing state-of-the-art equipment. That year, it entered into a banking relationship with Fleet National Bank, the predecessor-in-interest to defendant Sovereign; for simplicity we will refer to the bank as Sovereign throughout. Between 1998 and the end of 2002, Sovereign extended approximately $6.1 million in credit to the plaintiffs, which FAMM used to expand its facility and upgrade its equipment. During that time, Edward Powers, Sovereign's Vice President, was FAMM's main point of contact with the bank; Powers was the loan officer in charge of FAMM's account until March 2003.

In the fourth quarter of 2001, FAMM suffered an operating loss due to an unexpectedly harsh winter and other external adverse economic factors, along with the continued costs of renovating its facility. FAMM informed Powers of its financial difficulties.

Around the same time, FAMM's comptroller, Charles Stearns, informed the company he would be leaving at the end of the year, and FAMM began searching for a replacement. As the process dragged on, FAMM sought to hire an accountant from the firm of Paul

Seelye, who was FAMM's CPA, to oversee its finances on an interim basis. In January 2002, Ann Gavin discussed this plan with Powers. Powers stated that he was uncomfortable with this choice because he did not want someone from the company that did FAMM's auditing review also to be involved in FAMM's daily operations. He wanted Gavin to hire someone he had confidence in to oversee FAMM's accounting until the company could get a handle on its accounting department. Powers informed Gavin that person would be David Lee, an outside consultant with whom Powers and the bank had had some limited experience in the past. Gavin objected because Lee was at the time providing consulting services to a company owned by a former business partner of the Gavins with whom the Gavins were not on good terms, and because Lee did not have experience in the steel industry. Powers insisted, however, saying it was the bank's prerogative to have a consultant hired who made the bank feel secure in its financing. FAMM acquiesced and hired Lee.

FAMM continued to search for a permanent replacement for Stearns, the comptroller. It received the resume of Keith Woolford, along with those of several other prospective candidates, from Seelye; Seelye interviewed Woolford before passing on his resume to Ann Gavin. Gavin then interviewed Woolford and four other candidates. She narrowed the field to Woolford and one other candidate. The two were then interviewed by Ann Gavin, Paul Gavin, five FAMM managers, and Lee. At some point during the process, Ann

Gavin sent Powers an email with Woolford's resume attached indicating that FAMM was very interested in Woolford and was probably going to make an offer to him. Ann Gavin claims that Powers wanted Lee to be involved in the interviewing process so, in essence, FAMM needed Lee's approval to make the decision, although Powers claims the bank was not involved at all in the process. Regardless, the Gavins and the group of FAMM managers who conducted the interviews concluded that they could work with either candidate, and Lee preferred Woolford, so Woolford was chosen. Woolford was hired as FAMM's permanent comptroller, and began working in March 2002. After Woolford was hired, the bank instructed FAMM to retain Lee to supervise and train Woolford and to provide general oversight to FAMM's accounting department.

In the meantime, FAMM's financial condition continued to deteriorate. As a result of its losses in 2001, FAMM became in default of certain covenants contained in the Sovereign loan documents no later than February 2002, when Ann Gavin and Lee met with Powers to discuss the company's ongoing financial problems.[1] The losses continued in the first quarter of 2002. FAMM remained

---

[1]    There is some dispute over whether FAMM was already in default in January 2002, when Lee was hired. Plaintiffs conceded before the district court that FAMM was in default at all times after FAMM discovered Lee's mismanagement of its accounts, that is, from the end of 2002 on; but they maintained there was no covenant default when Sovereign forced FAMM to hire Lee, that is, in January 2002. This issue is immaterial to our analysis.

-5-

in covenant default in 2002 and 2003.[2]  Sovereign agreed to waive the 2001 covenant default in mid-2002; it did not waive the covenant defaults for 2002 and 2003, although plaintiffs claim the bank indicated such waivers would be forthcoming.

Lee's and Woolford's management did not help matters. During 2002, Lee and Woolford failed to reconcile FAMM's general ledger accounts and grossly overstated job revenues for work in progress.  They had also neglected to reconcile FAMM's monthly bank statements and failed to pay monthly sales taxes.  Lee and Woolford presented FAMM with inaccurate financial data that showed the company was turning a profit when in fact it was still losing money.  According to Lee's and Woolford's numbers, the company expected a $300,000 profit that year; in reality, it lost $1.1 million.  FAMM relied on these numbers in making business decisions over the course of the year.  Plaintiffs claim that if the company had known its true financial conditions, it would have booked additional projects that were available to it, reduced overhead, withheld bonuses from employees, and avoided perks such as buying company cars and giving employees extra vacation days.

According to plaintiffs, FAMM did not become aware of these irregularities until October 31, 2002, when Lee revealed to Ann Gavin that he had not reviewed or reconciled certain accounts

---

[2]    Plaintiffs claim FAMM remained current on all its loan payments, but FAMM over-borrowed the funds available on its line of credit on at least one occasion.

since he started.[3]  Shortly thereafter, on November 14, 2002, Lee resigned.  On January 3, 2003, FAMM fired Woolford.

In January 2003, after learning the full extent of these irregularities, Ann Gavin met with Powers to discuss the situation. Powers instructed Gavin to hire a bank-approved turnaround consultant, Joe Picano; Powers stated that if FAMM did so, the company's account would remain with him and would not be moved to another department.  Nonetheless, in March 2003, FAMM's account with Sovereign was transferred to John Bowen in the Managed Assets Division.

In the months that followed the revelation of Lee's and Woolford's alleged misconduct, Sovereign engaged in a series of actions that plaintiffs claim seriously exacerbated the situation; according to plaintiffs, Sovereign's "goal was to close FAMM, minimize [Sovereign's] exposure and maximize the value of its credit."  This theory about Sovereign's purported motive is not further explained.

In February 2003, Sovereign terminated automatic sweeps between FAMM's checking account and its line of credit, without notifying FAMM; this caused the account to be overdrawn.  After the automatic sweeps were stopped, FAMM had to manually manage its account; however, it was unable for some reason to view its account

---

[3]  The record does show that Ann Gavin was aware of the non-payment of sales taxes as early as August 2002.

online, and thus could not determine which of its checks had cleared on a daily basis. Plaintiffs claim that Sovereign also mishandled FAMM's general disbursement account, causing at least one check to bounce, and that it failed to reproduce in a timely manner certain bank statements and checks from 2002 that FAMM had requested. Sovereign did not respond to inquiries from FAMM's suppliers, subcontractors, and other third parties. It also failed to enter into a forbearance agreement with FAMM and did not respond to various workout or refinancing proposals.

Plaintiffs claim Sovereign committed to issuing a forbearance agreement and to extending FAMM's line of credit if FAMM paid down the line. Nonetheless, no forbearance agreement was issued, and Sovereign terminated FAMM's line of credit on May 31, 2003. In March 2004, Sovereign sold FAMM's loans to a third party for $1.725 million; after the sale, FAMM's facility was shut down and its assets were liquidated. Sovereign lost over $4 million.

FAMM, Austin, Ann Gavin, and Paul Gavin brought suit against Sovereign on December 29, 2006. The complaint raised twelve claims against the bank: breach of contract (count I); breach of implied covenant of good faith and fair dealing (counts II, III, and IV); breach of fiduciary duty (counts V and VI); aiding and abetting a breach of fiduciary duty (count VII); liability under an instrumentality theory (count VIII); fraud (count IX); duress (count X); interference with advantageous

business relations (count XI); and violation of chapter 93A of the Massachusetts General Laws (count XII). On November 9, 2007, after discovery was completed, the Gavins agreed to voluntarily dismiss their claims against Sovereign, but FAMM's and Austin's claims remained. Sovereign filed a motion for summary judgment against the remaining plaintiffs on November 16, 2007.

The district court granted summary judgment to Sovereign on all claims on June 30, 2008. It found that the level of control necessary for liability under an instrumentality theory did not arise in this case. Gavin, 2008 WL 2622839, at *3-5. It rejected the covenant of good faith and fair dealings claims, which plaintiffs based on nine separate events. The court found that seven of these alleged events, even if true, did not involve dishonesty or an attempt by the bank to injure FAMM purposefully. See id. at *5-6. As for the other two events -- the allegations that Sovereign promised and failed to issue a forbearance agreement and that it similarly promised and failed to extend FAMM's line of credit if FAMM paid down the line -- the court found plaintiffs had not provided sufficient support, so there was no genuine issue of material fact. See id. at *6. The court held that no fiduciary relationship arose in this case and added that "[a] finding to the contrary would transform all lenders who exercise oversight of their financially distressed borrowers into fiduciaries." Id. at *7. The court rejected the interference with advantageous business

relations claim on the grounds that, even if Sovereign knew its actions would prevent FAMM from pursuing certain business opportunities, there is nothing to suggest its actions were improper in motive or means. See id. at *7-8. It found there was no evidence that Sovereign knowingly made misrepresentations or that it was the constructive author of any false statements allegedly made by Lee; it also found the circumstances in this case did not rise to the level of economic duress. See id. at *8. Finally, the court found that because plaintiffs' common law claims failed, their claim under Mass. Gen. Laws ch. 93A was necessarily foreclosed. Id. at *9.

Plaintiffs timely appealed.

II.

Because we affirm the grant of summary judgment on the merits, we do not resolve whether plaintiffs' tort claims were barred by Massachusetts's three-year statute of limitations, Mass. Gen. Laws ch. 260, § 2A.

A.        Covenant of Good Faith and Fair Dealing

Plaintiffs claimed in counts I through IV of the complaint that Sovereign was liable for breach of the state law implied covenant of good faith and fair dealing.[4]        Under

---

[4]        Count II alleged breach of the implied covenant, and counts III and IV alleged the same but as a violation of the Massachusetts Uniform Commercial Code and as a tort respectively. Count I alleged a breach of contract, but this claim is also based solely on the same alleged breach of the implied covenant of good

-10-

Massachusetts law, every contract is subject to an implied covenant of good faith and fair dealing; the purpose of the implied covenant is to "ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract" and that "when performing the obligations of the contract, the parties 'remain faithful to the intended and agreed expectations' of the contract." Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007) (quoting Uno Rests., Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004)). "[T]he scope of the covenant is only as broad as the contract that governs the particular relationship." Id. (quoting Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005)) (internal quotation marks omitted). "The covenant does not supply terms that the parties were free to negotiate, but did not, nor does it 'create rights and duties not otherwise provided' for in the contract." Id. (citation omitted) (quoting Ayash, 822 N.E.2d at 684). In the lender-borrower context, the implied covenant "would require that the bank be honest in its dealings with [plaintiffs] and that it not purposefully injure [their] right to obtain the benefit of the contract." Shawmut Bank, N.A. v. Wayman, 606 N.E.2d 925, 928 (Mass. App. Ct. 1993); accord In re Greenberg, 212 B.R. 422, 429 (Bankr. D. Mass. 1997); Ferris v. Fed. Home Loan Mortgage Corp., 905 F. Supp. 23, 28 (D. Mass. 1995).

faith and fair dealing.

Before the district court, plaintiffs based their breach of implied covenant claim on nine actions taken by Sovereign in the period after FAMM discovered Lee's mismanagement. These actions were: (1) terminating in February 2003 the automatic cash sweeps; (2) failing thereafter to allow FAMM to manage its account online, thus making it impossible for FAMM to verify on a daily basis which of its checks had cleared; (3) mishandling FAMM's account and causing at least one check to bounce; (4) refusing to answer third party phone calls or inquiries from FAMM's subcontractors, suppliers, tax collection agencies, and others; (5) failing to respond to restructuring proposals or offers to purchase; (6) failing to respond in a timely manner to FAMM's requests for copies of certain checks and bank statements; (7) failing to waive the 2002 and 2003 covenant defaults; (8) failing to issue a forbearance agreement despite promises to do so; and (9) failing to extend FAMM's line of credit despite saying it would do so if FAMM paid down the line.

As to the first seven allegations, the district court found that even if true, none of these actions involved dishonesty and that plaintiffs failed to show that any were purposefully done to injure FAMM. Gavin, 2008 WL 2622839, at *6. We agree with the district court's conclusion, and plaintiffs make no attempt to explain how it was erroneous. Moreover, both before the district court and on appeal, plaintiffs pointed to no provision in the loan

-12-

agreements that obligated Sovereign to take actions such as continuing the automatic sweeps, providing the desired online access, engaging in workout negotiations, or answering third party questions; certainly there is no evidence the loan agreements required Sovereign to waive the 2002 or 2003 covenant defaults (although it could have chosen to do so as it eventually did for the 2001 default).

Moreover, it is important that at the time all these events occurred, FAMM was in covenant default. See F.D.I.C. v. LeBlanc, 85 F.3d 815, 822 (1st Cir. 1996) (finding, under Massachusetts, law no breach of the implied covenant in a bank's "hard-nosed" dealings with a borrower where it was undisputed that the bank did not take any of the adverse actions before the borrower defaulted). When the borrower is in default, that necessarily alters the contours of the covenant of good faith and fair dealing.

As to the final two allegations, the district court found there was insufficient evidence to support the allegation that Sovereign misled FAMM by promising to issue a forbearance agreement and further promising to extend FAMM's line of credit if FAMM paid down the line. Gavin, 2008 WL 2622839, at *6. We agree. In their opposition to summary judgment, plaintiffs presented the following

evidence in support of their claims.[5]  First, Ann Gavin testified that "we were told we would have a forbearance agreement by the end of March [2003], then the end of April, then the end of May, then the end of June," and that when this did not happen, FAMM decided to try to engage in workout negotiations.  Moreover, she stated, "we had been told that the line was going to be extended, and [Bowen] asked us to make some paydowns based on that, which we did."  Second, FAMM's turnaround consultant, Picano, testified that through August 2003, "no terms of any formal forbearance agreement had been negotiated."  Third, plaintiffs point to a letter Ann Gavin sent to Bowen after the line was not extended that said: "My line was shut off in May 2003 -- after you advised Joe Picano and I that it would be extended.  (I made a paydown based on your commitment.)"

On the other hand, Ann Gavin also admitted that "no specific discussion of terms" had ever occurred with regards to a potential forbearance agreement, and that Bowen merely "told me that he would get it to us."  Moreover, in response to the contents of Gavin's letter to Bowen, Picano testified that he did not remember Bowen ever "advising us that the line was going to be

---

[5]     In their brief on appeal, plaintiffs point to nothing in the record in support of this claim, but simply assert that "it is undisputed that Sovereign manipulated FAMM into its using funds to pay the line of credit down by promising that it would issue an extension and forbearance agreement."  This unsupported assertion is contrary to the requirements of Fed. R. App. P. 28(a)(9)(A).

-14-

extended," and that he was not surprised when he learned the line of credit was not going to be extended.

Even taken in the light most favorable to the plaintiffs, this evidence cannot reasonably support the conclusion that Sovereign misled FAMM or attempted purposefully to injure it. FAMM and Sovereign were engaged in negotiations that never yielded an agreement; in fact, these negotiations never even reached the stage of discussing specific terms. This does not constitute any breach of the implied covenant of good faith and fair dealing.

For the first time on appeal, plaintiffs assert that Sovereign's forcing FAMM to hire Lee, in and of itself, was a breach of the implied covenant; they claim Powers misrepresented that he had the authority to demand that FAMM hire Lee. This argument is waived. Even if it were not, it fails. There is no evidence that Sovereign acted dishonestly or purposefully to injure FAMM by insisting that it hire Lee. There is no evidence that Sovereign or Powers had any indication that Lee would not perform his job adequately.

Plaintiffs also raise new arguments based on Illinois law, under which they assert that the implied covenant requires a bank to exercise its discretion reasonably, see BA Mortgage & Int'l Realty Corp. v. Am. Nat'l Bank & Trust Co. of Chi., 706 F. Supp. 1364, 1373 (N.D. Ill. 1989). These arguments are also waived, and regardless, plaintiffs point to no case law suggesting that this

reading of the implied covenant of good faith and fair dealing is accepted under Massachusetts law, or to any evidence demonstrating that Sovereign exercised its discretion in an unreasonable manner.

B.        Fiduciary Duty

Plaintiffs claimed in counts V and VI that Sovereign was liable for breach of fiduciary duty. As plaintiffs wisely concede, under Massachusetts law, the relationship between a lender and a borrower, without more, does not establish a fiduciary relationship. See, e.g., Superior Glass Co. v. First Bristol County Nat'l Bank, 406 N.E.2d 672, 674 (Mass. 1980); see also In re Greenberg, 212 B.R. at 428 (collecting cases); 1 Lender Liability: Law, Practice and Prevention § 5.1 (2009). A fiduciary relationship may arise in this context where the borrower reposes its trust and confidence in the lender and the lender knows of and accepts the borrower's trust. See Superior Glass, 406 N.E.2d at 674; Broomfield v. Kosow, 212 N.E.2d 556, 560 (Mass. 1965) ("[T]he plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. The catalyst in such a change is the defendant's knowledge of the plaintiff's reliance upon him."); Warsofsky v. Sherman, 93 N.E.2d 612, 615 (Mass. 1950); Blais v. Warren Five Cents Sav. Bank, 1993 Mass. App. Div. 213 (Mass. Dist Ct. 1993); see also Pimental v. Wachovia Mortgage Corp., 411 F.

-16-

Supp. 2d 32, 40 (D. Mass. 2006); In re Greenberg, 212 B.R. at 428-29; 1 Lender Liability: Law, Practice and Prevention, supra, § 5.1.

No fiduciary relationship arose in this case; FAMM's relationship with Sovereign was an arms-length, lender-borrower business relationship, not one of trust and confidence. Even if FAMM had reposed its trust in Sovereign, plaintiffs provided no evidence that Sovereign was aware of or accepted this trust, a necessary condition for finding a fiduciary relationship. See Warsofsky, 93 N.E.2d at 614-16 (finding that where defendant, a member of the security committee of a cooperative bank, acting solely in his capacity as an official of the bank, was given confidential information by plaintiff, an individual seeking to secure a loan from the bank, and defendant "understood that the information was given to him in confidence as a director and member of the security committee of the cooperative bank, and he received the information in that capacity and solely for the purpose of enabling himself and other officials of the bank to determine whether the security warranted the granting of the loan," the defendant bank officer had "a fiduciary relation toward the plaintiff with reference to the matters disclosed" and could not use the information for his personal gain as against either the plaintiff or the bank); see also Patsos v. First Albany Corp., 741 N.E.2d 841, 851-52 (Mass. 2001) (finding that a jury could reasonably conclude a fiduciary relationship existed between a

broker and his customer where the customer lacked sophistication and experience as an investor, the broker was aware of this inexperience and encouraged the customer to rely on his expertise by promising financial benefits, favorable margin treatment, and private stock sales, the broker told the customer he was conducting transactions solely for the customer's benefit, the broker was in complete control of the account and executed transactions without the prior authorization of the customer, and the broker, when questioned by the customer, told the him that he need not worry about his inability to understand the monthly statements or the terms of the customer agreement). Moreover, the record is that FAMM did not repose its trust in Sovereign. To the contrary, FAMM alleges it resisted Powers's recommendation that it hire Lee, and that it only hired Lee because it was forced to do so, over its objection.

Plaintiffs argue, in the alternative, that a fiduciary relationship arose in this case because Sovereign exerted control over FAMM.[6] Massachusetts courts have recognized that, under certain circumstances, a lender may actively participate in or exercise control over the business of a borrower to such an extent that a fiduciary relationship arises. See Shawmut, 606 N.E.2d at

_____

[6] Defendant incorrectly argues that plaintiffs waived this argument by failing to raise it before the district court. Plaintiffs argued that a fiduciary relationship existed because Sovereign exerted control over FAMM in their motion in opposition to summary judgment.

928; <u>Levesque</u> v. <u>Ojala</u>, No. 20034485, 2005 WL 3721859, at *22-23 (Mass. Super. Ct. Dec. 8, 2005); <u>see</u> <u>also</u> <u>In re Fordham</u>, 130 B.R. 632, 648-49 (Bankr. D. Mass. 1991); 1 <u>Lender Liability: Law, Practice and Prevention</u>, <u>supra</u>, §§ 5.1, 5.7. Massachusetts courts have not defined what level of control is sufficient to give rise to a fiduciary duty under this theory, but have held that involvement in the debtor's affairs that is not unusual in the context of a commercial loan is clearly insufficient. <u>Shawmut</u>, 606 N.E.2d at 928 (holding that a bank's "right to receive regular financial reports and monitor [the debtor's] performance, and even to limit salaries paid . . . , was not at all unusual in the context of a commercial loan and [did] not create a fiduciary relationship"); <u>see</u> <u>also</u> <u>In re Fordham</u>, 130 B.R. at 649 (holding that a lender's "meeting with consulting engineers, reviewing and approving construction plans, approving the construction manager, and reviewing requisitions" was insufficient control to give rise to a fiduciary duty). In general, "[c]ontrol does not arise unless the plaintiff can show that the creditor has obtained the power to direct the day-to-day management of the debtor." 1 <u>Lender Liability: Law, Practice and Prevention</u>, <u>supra</u>, § 5.8; <u>see</u> <u>also</u> <u>id.</u> § 5.7 ("[A] lender may offer advice and use the leverage which its position gives it vis-a-vis the debtor, without being viewed as controlling the debtor, so long as the debtor continues to operate,

-19-

and the management of the debtor continues to make its own business decisions.").

Plaintiffs have not produced facts permitting the conclusion that Sovereign exerted a level of control over FAMM that was unusual in the commercial context or that Sovereign was able to direct FAMM's day-to-day affairs. Even if Sovereign required that FAMM hire Lee, there is no evidence that Lee acted under Sovereign's directions. More importantly, Ann and Paul Gavin remained the President and Vice President of the company, and plaintiffs do not allege the Gavins did not have final say over the company's decisions. Beyond this, FAMM hired a permanent comptroller, Woolford, in March 2002; Lee was to train and oversee Woolford, and there is no evidence Woolford's decisions were dictated by Lee or Sovereign. Thus, plaintiffs have not shown Sovereign controlled FAMM to such an extent that a fiduciary relationship was created.

Plaintiffs further claim Sovereign aided and abetted a breach of fiduciary duty on the part of Lee by directing Lee to suspend FAMM's monthly financial reports, and thus that the district court erred in granting summary judgment as to count VII of their complaint. The record shows that after he was hired, Lee asked Powers for permission not to turn in FAMM's monthly financial statements until the permanent comptroller was hired, that Powers agreed, and that by April 2002, just three months later, FAMM

resumed regular reporting and also submitted the previous months' reports. Plaintiffs' perfunctory argument does not explain how this action constituted a breach of fiduciary duty by Lee, much less one which Sovereign aided and abetted.

C.        Instrumentality Theory of Lender Liability

Count VIII of plaintiffs' complaint alleged that Sovereign was liable on the basis of an instrumentality theory. Where the theory is recognized, a lender may be held liable under the common-law instrumentality theory when the lender exerts such a degree of control over the borrower that the borrower becomes a mere business conduit for the lender. Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp., 483 F.2d 1098, 1102-07 (5th Cir. 1973), reh'g denied 490 F.2d 916 (5th Cir. 1974); see also Schwan's Sales Enters., Inc. v. Commerce Bank & Trust Co., 397 F. Supp. 2d 189, 194 (D. Mass. 2005); F.C. Imports, Inc. v. First Nat'l Bank of Boston, N.A., 816 F. Supp. 78, 91-92 (D.P.R. 1993); 1 Lender Liability Law and Litigation § 1.03[4][a] (2009); Lender Liability and Banking Litigation § 6.02 (2009). At least one Massachusetts trial court decision has suggested that under certain circumstances creditors may be held liable under the instrumentality theory. See Healy v. McGhan Med. Corp., No. CA975320, 2001 WL 717110, at *6 (Mass. Super. Ct. Mar. 29, 2001) (citing F.C. Imports, 816 F. Supp. at 91-92); see also Schwan's Sales, 397 F. Supp. 2d at 194 (applying the instrumentality theory in a case governed by

-21-

Massachusetts law and citing Healy).  But neither the Supreme Judicial Court nor the Appeals Court, as best we can determine, has ever adopted the theory.

Even if Massachusetts were to be hospitable to the instrumentality theory, as utilized in some other states, the theory would not apply here.  First, plaintiffs suggest a radical alteration to the theory.  The instrumentality theory is akin to the piercing of the corporate veil doctrine, and has generally been used by third party creditors seeking to hold a lender liable for the debts of the borrower.  See Krivo, 483 F.2d at 1102 (noting, in a suit brought by third party creditors to recover from another creditor on the debts of the borrower, that "[o]ne of the most difficult applications of the rule permitting the corporate form to be disregarded arises when one corporation is sought to be held liable for the debts of another corporation . . . [on the grounds that] it [has] misuse[d] that corporation by treating it, and by using it, as a mere business conduit for the purposes of the dominant corporation."); see also F.C. Imports, 816 F. Supp. at 91-92 (discussing instrumentality theory in suit brought by wholesale supplier against bank from which a retail seller had borrowed to recover from the bank on debts owed by the seller to the supplier); Healy, 2001 WL 717110, at *6 (discussing instrumentality theory in the context of an attempt by a third party to recover from a creditor on the basis of debtor's actions).  Here, plaintiffs are

-22-

debtors seeking to use the instrumentality theory to recover damages from their own creditor. They were not in the least misled as to who their creditor was. Plaintiffs point to no cases that recognize this novel application of the instrumentality theory, and there is no indication that such an application would be accepted by the Massachusetts courts.

Further, the district court correctly found that, even under the usual theory, the facts alleged by plaintiffs cannot support the conclusion that Sovereign exercised sufficient control over FAMM to give rise to liability. Of course, the mere existence of a creditor-debtor relationship does not by itself give rise to the level of control necessary for liability under the instrumentality theory; if it were otherwise, lenders would rightfully be reluctant to extend credit. Krivo, 483 F.2d at 1104; accord F.C. Imports, 816 F. Supp. at 91; Healy, 2001 WL 717110, at *6. Indeed, even when the creditor "tak[es] an active part in the management of the debtor corporation," this is not by itself sufficient. Krivo, 483 F.2d at 1105; see also Chi. Mill & Lumber Co. v. Boatmen's Bank, 234 F. 41, 43-44, 46 (8th Cir. 1916) (finding insufficient control in a case in which a lending bank arranged for its employee to become president of the debtor company in order to protect the bank's interests).

To establish liability under the instrumentality theory, courts have required "a strong showing that the creditor assumed

actual, participatory, total control of the debtor"; the facts must "unmistakably show[] that the subservient corporation was being used to further the purposes of the dominant corporation and that the subservient corporation in reality had no separate, independent existence of its own." Krivo, 483 F.2d at 1105; see also Schwan's Sales, 397 F. Supp. 2d at 195; 1 Lender Liability Law and Litigation, supra, § 1.03[4][a] ("[T]he creditor's control and dominance over the borrower [must be] so substantial as to indicate that the effective control of the borrower's operations and affairs rests with the creditor."); Lender Liability and Banking Litigation, supra, § 6.02[3][b][i] ("[A] bank may properly share control of, or oversee, a debtor's business so long as it does not totally dominate the debtor's affairs.").

Here, plaintiffs have failed to make such a showing. Although Powers and Lee interacted, there is no evidence that Sovereign directed Lee's actions, or that, even if it did, Sovereign had assumed actual, participatory, total control over FAMM's affairs. Indeed, such an inference seems implausible in light of the losses the bank suffered as a result of Lee's actions. Moreover, Ann and Paul Gavin continued to serve as President and Vice President of the company throughout this period, and FAMM had a permanent comptroller starting in March 2002.

The district court did not err in granting summary judgment as to plaintiffs' instrumentality theory claim.

D.        Fraud

Plaintiffs further claimed, in count IX of the complaint, that Sovereign is liable on the basis of fraud.  Under Massachusetts law, plaintiffs were required to show that: (1) defendant made a false representation with knowledge of its falsity for the purpose of inducing plaintiffs to act thereon; (2) that plaintiffs relied upon the representation as true and acted upon it to their detriment; and (3) that plaintiffs' reliance was reasonable under the circumstances.  Rodi v. S. New Eng. Sch. of Law, 532 F.3d 11, 15 (1st Cir. 2008).

Before the district court, plaintiffs based their claim in part on a number of allegedly false representations made by Lee on which FAMM allegedly relied to its detriment.  The district court rejected this argument, noting that plaintiffs brought the suit against Sovereign, not against Lee, and that there is no basis for holding Sovereign liable as the constructive author of any false statements that Lee allegedly made.  Gavin, 2008 WL 2622839, at *8.  We agree with the district court's conclusion, and plaintiffs do not challenge it.

Plaintiffs also based their fraud claim on Sovereign's conduct in forcing FAMM to hire Lee.  They claim Powers falsely represented that it was the bank's prerogative to have FAMM hire someone the bank was comfortable with as the temporary comptroller.  However, plaintiffs point to nothing in the loan agreements to show

-25-

Powers's statement was false.  Plaintiffs also claim Sovereign falsely represented Lee's competency, but as the district court noted, there is no evidence in the record that Sovereign knew Lee was not qualified or competent.

Plaintiffs argue for the first time on appeal that Sovereign committed fraud by saying it would issue a forbearance agreement and extend FAMM's line of credit if FAMM paid down the line.  This argument is waived, and in any case, for the reasons discussed in section II.A, supra, the evidence is not sufficient on this point to support the conclusion that Sovereign knowingly made any false statements for the purpose of inducing FAMM to act.

E.      Duress

Summary judgment was also properly granted as to plaintiffs' duress claim, which was count X of the complaint.  An economic duress claim requires plaintiffs to establish: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." Int'l Underwater Contractors, Inc. v. New Eng. Tel. & Tel. Co., 393 N.E.2d 968, 970 (Mass. App. Ct. 1979) (quoting Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 389 (Ct. Cl. 1969)) (internal quotation marks omitted).

Plaintiffs alleged that FAMM hired Lee under duress because Sovereign threatened to call in its loans if FAMM refused

to do so and that FAMM had no alternatives as a result of the bank's demands; thus, plaintiffs argue, Sovereign is liable for the damages later caused by the person it forced FAMM to hire. Duress is generally used as an affirmative defense, see 17 Massachusetts Practice § 2.49 (2008), and it is unclear whether Massachusetts courts would recognize duress as a tort on which plaintiffs could recover damages, see Leventhal v. Dockser, 282 N.E.2d 680, 681 (Mass. 1972); see also Augat, Inc. v. Collier, No. 92-12165, 1996 WL 110076, at *35 (D. Mass. Feb. 8, 1996); State Nat'l Bank of El Paso v. Farah Mfg. Co., 678 S.W.2d 661, 683 (Tex. App. 1984), writ dismissed by agreement. Plaintiffs offer no cases that show their use of duress is proper under Massachusetts law.

Even assuming this is a proper cause of action under Massachusetts law, plaintiffs cannot sustain a claim of duress. Plaintiffs have pointed to nothing in the record to show that any action by the bank to pressure FAMM to hire Lee would have been inappropriate under the loan agreements. If FAMM was placed in a situation in which it had no choice but to hire Lee, this resulted only from a contractual business arrangement into which FAMM freely entered, and not from any coercive acts on the part of Sovereign. See Int'l Underwater Contractors, 393 N.E.2d at 972.[7]

---

[7] We need not address the district court's conclusion that FAMM did not hire Lee under duress because it was in covenant default at the time.

F.        Interference with Advantageous Business Relations

The district court also properly granted summary judgment on count XI, in which plaintiffs claimed Sovereign tortiously interfered with advantageous business relations by: preventing FAMM from hiring a temporary comptroller from its CPA's firm; failing to respond timely to buy-out proposals and other refinancing options; and preventing FAMM from pursuing certain third-party contracts by refusing to grant FAMM a forbearance or extension after FAMM paid down part of its outstanding debt.  Under Massachusetts law, plaintiffs were required to show that: "(1) [they] had an advantageous relationship with a third party . . . ; (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff[s] [were] harmed by the defendant's actions." Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007).

Even assuming Sovereign by its actions knowingly interfered with FAMM's advantageous business relations, we agree with the district court that there is no evidence Sovereign's actions were improper in motive or means.  Plaintiffs alleged Sovereign was motivated by a desire to "close FAMM, minimize [Sovereign's] exposure and maximize the value of its credit."  But the record does not establish that Sovereign acted out of any purpose beyond the "legitimate advancement of its own economic

-28-

interest, [and] that motive is not 'improper' for purposes of tortious interference."[8]  Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 815 N.E.2d 241, 245-46 (Mass. App. Ct. 2004). FAMM was in serious financial trouble and was in covenant default at least as early as February 2002, and Sovereign was attempting to protect its financial interest.  Nor did Sovereign employ improper means to this end; it was not obligated to grant a forbearance or an extension or to engage in workout negotiations, and its actions were permissible under the loan agreements.  See id. at 246-47. That Sovereign's decisions may have proven ill-advised, and ultimately contributed to significant losses for both FAMM and Sovereign, does not make Sovereign's actions tortious.

G.      Chapter 93A

The final count of plaintiffs' complaint alleged that Sovereign violated chapter 93A of the Massachusetts General Laws, which forbids "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a).  A chapter 93A claim "requires a showing of conduct that (1) falls within 'the penumbra of some common-law, statutory, or other established concept of unfairness'; (2) is 'immoral, unethical, oppressive, or unscrupulous'; and (3) causes 'substantial injury to

_____

[8]      Plaintiffs also argued for the first time on appeal that Powers was motivated by personal reasons -- seeking to return a favor -- in trying to get FAMM to hire Lee.  This argument is waived and in any case finds no support in the record.

-29-

[consumers or other businesspersons].'" Jatsy v. Wright Med. Tech., Inc., 528 F.3d 28, 37 (1st Cir. 2008) (alteration in original) (quoting Serpa Corp. v. McWane, Inc., 199 F.3d 6, 15 (1st Cir. 1999)); accord Heller Fin. v. Ins. Co. of N. Am., 573 N.E.2d 8, 12-13 (Mass. 1991); see also Ahern v. Scholz, 85 F.3d 774, 798 (1st Cir. 1996). Plaintiffs' chapter 93A claim is based wholly on its common-law claims. Because these underlying claims fail, it is clear that plaintiffs have not shown the conduct complained of fell within any common-law, statutory, or other established concept of unfairness; thus, summary judgment was properly granted as to the chapter 93A claim. Pembroke Country Club, 815 N.E.2d at 247; see also Lily Transp. Corp. v. Royal Institutional Servs., Inc., 832 N.E.2d 666, 686 (Mass. App. Ct. 2005) (Laurence, J., concurring in part and dissenting in part) (collecting cases).

## III.

The judgment of the district court is affirmed. Defendant's March 30, 2009 motion for sanctions under Fed. R. App. P. 38, which argued that plaintiffs' appeal was frivolous, is denied. So ordered.